**Defendants' Exhibit A**
**Third Amended Complaint**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BRETT BOLMER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | 3:06 – CV – 00235 (JBA) |
| | ) | |
| **JOSEPH OLIVEIRA, M.D.,** | ) | |
| **MALENA SANGUT,** | ) | |
| **DIANE DeKEYSER, M.D.,** | ) | |
| **VICTOR ESTABA, M.D.,** | ) | |
| **DONNA PELLERIN, M.D.,** | ) | |
| **CONNECTICUT DEPT. OF** | ) | July 20, 2007 |
| **MENTAL HEALTH AND ADDICTION** | ) | |
| **SERVICES,** | ) | |
| and **DANBURY HOSPITAL,** | ) | |
| | ) | |
| Defendants. | ) | |

### THIRD AMENDED COMPLAINT

### I. INTRODUCTORY STATEMENT

This civil rights action arises out of the involuntary commitment of Brett Bolmer

that occurred on or about September 14, 2004 in Danbury, Connecticut, by defendants

Oliveira, Sangut and DHMAS at the central office of Greater Danbury Mental Health

Authority ("GDMHA") of the Connecticut Department of Mental Health and Addiction

Services ("DMHAS"). These defendants forcibly confined Mr. Bolmer even though Mr.

Bolmer did not pose a danger to himself or others. The commitment occurred after Mr.

Bolmer reported incidents of inappropriate sexual conduct by Lisa Kaminski, a former

caseworker for GDMHA, with whom Mr. Bolmer carried on an affair. Defendants

1

Oliveira and DMHAS simply assumed that the allegations made by Mr. Bolmer were untrue because Mr. Bolmer had a mental illness. They therefore assumed that his allegations were delusions. Defendant Oliveira determined that these alleged delusions warranted in-patient treatment, and he authorized Mr. Bolmer's involuntary hospitalization. Once Mr. Bolmer knew that he was being held against his will, he became angry. Defendant Oliveira then interpreted this rational and appropriate response to an unlawful deprivation of liberty as further evidence of danger that justified confinement. At no time did Mr. Bolmer pose a risk of causing harm to himself or others. The actions by defendants Oliveira and DMHAS violated the substantive component of the Due Process Clause of the Fourteenth Amendment and additionally constituted false imprisonment.

In addition, during the illegal involuntary commitment, the defendants at Danbury Hospital subjected Mr. Bolmer to forced medications and forcible restraints without statutory justification. They refused to believe that his statements were true simply because he was a person with a mental illness. They considered these statements to be, therefore, delusional. Mr. Bolmer further asserts that these actions also violated the substantive component of the Due Process Clause and constituted battery and false imprisonment. Finally, Mr. Bolmer asserts that defendants Dekeyser and Estaba violated his rights under the procedural component of the Due Process Clause. Mr. Bolmer seeks compensatory and punitive damages.

2

## II. PARTIES

1.    Plaintiff, Brett Bolmer, was a resident of Danbury, Connecticut and a person with psychiatric disabilities at all times relevant to this complaint.

2.    Defendant Joseph M. Oliveira, M.D. is a practicing psychiatrist in the State of Connecticut and at all relevant times employed by GDMHA.

3.    Defendant Diane Dekeyser, M.D. was an employee of Danbury Hospital at all times relevant to this complaint.

4.    Defendant Victor Estaba, M.D., was an employee of Danbury Hospital at all relevant times in this complaint.

5.    Defendant Donna Pellerin, M.D. was an employee of Danbury Hospital at all times relevant in this complaint.

6.    Defendant Malena Sangut was an employee of GDMHA at all relevant times in this complaint.

7.    Defendant DMHAS is a state agency providing and administrating mental health and addiction services for Connecticut residents through several branch offices, one of which is the GDMHA office in Danbury, Connecticut where the involuntary commitment occurred.

8.    Defendant, Danbury Hospital is a private hospital in Danbury, Connecticut, that receives federal financial assistance.  Upon information and belief, defendant Danbury Hospital also receives reimbursements from Medicare and Medicaid. In addition to general medical care, Danbury Hospital provides emergency psychiatric services.

3

### III.  JURISDICTION AND VENUE

9.      The Federal District Court for the District of Connecticut may maintain

jurisdiction over this matter.  28 U.S.C. § 1331.  The court may also base jurisdiction on

the case based on the existence of an action pursuant to 42 U.S.C. § 1983.  28 U.S.C. §

1343(a)(3).  Supplemental jurisdiction exists because state law claims have arisen out of

the same nucleus of operative facts as the federal claims and are so related to the federal

claims that they form part of the same case.  28 U.S.C. § 1367.

10.     The Federal District Court for the District of Connecticut is the proper

venue for the claims in this action because all relevant events occurred within the State of

Connecticut.  28 U.S.C. § 1391(b).

### IV.  RELEVANT STATUTORY SCHEME

11.     Subject to the provisions of this subchapter, no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or be

denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity.  42 U.S.C. § 12132.

12.     No otherwise qualified individual with a disability in the United States . . .

shall, solely be reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance.  29 U.S.C. § 794.

### V.  STATEMENT OF FACTS

13.     Plaintiff resided in Danbury, Connecticut at all times relevant to the

complaint.

4

14.    During all times set forth in this complaint, Mr. Bolmer was an individual with both psychiatric disabilities and a traumatic brain injury.

15.    Defendants regarded Mr. Bolmer as being substantially limited in the major life activity of being able to live independently.

16.    Plaintiff was a DMHAS client at all the times relevant to this complaint and expected DMHAS, through GDMHA, to provide him mental health services that complied with standard medical practices in general and specifically standard psychiatric practices

17.    Approximately one year before Mr. Bolmer's involuntary commitment, Lisa Kaminski, a former staff person assigned for GDMHA Transitional Housing Project assigned to Mr. Bolmer, began a sexual relationship with Mr. Bolmer.

18.    The sexual relationship continued until early September 2004.

19.    On or about September 14, 2004, Lisa Kaminski abruptly ended the relationship.

20.    On or about September 14, 2004, Mr. Bolmer met with Richard Hammond, the Director of the Transitional Housing Program ("THP"), a branch of GDMHA, at Mr. Hammond's Elm Street office.

21.    Mr. Bolmer complained to Mr. Hammond of Lisa Kaminski's sexual misconduct with him.

22.    Mr. Bolmer then left Mr. Hammond's office and went to the central GDMHA office, where he met Mike Anello, a caseworker for GDMHA.

23.    Mr. Bolmer reported Lisa Kaminski's sexual misconduct to Mr. Anello.

5

24.    Mr. Anello asked Mr. Bolmer to wait in his office, without giving a reason
for this request, and then left his office.

25.    Because Mr. Bolmer did not know the reason for this request, Mr. Bolmer
eventually left the office without further discussion with Mr. Anello.

26.    During the same period of time on or about September 14th during which
Mr. Bolmer has complained about Ms. Kaminski's conduct, Ms. Kaminski complained to
GDMHA management about an allegedly sexually explicit message left by Mr. Bolmer
on her voicemail that day.

27.    Ms. Kaminski failed to divulge to GDMHA management that she had
been involved in a sexual relationship with Mr. Bolmer.

28.    Because Ms. Kaminski failed to divulge that she had been involved in a
sexual relationship with Mr. Bolmer, GDMHA management assumed, without
investigation, that any inappropriate contact or other communication between Mr. Bolmer
and Ms. Kaminski was precipitated by Mr. Bolmer.

29.    Defendant Sangut, Defendant Oliveira and other GDMHA staff assumed,
without investigation, that no sexual relationship between Mr. Bolmer and Ms. Kaminski
existed.

30.    Defendant Sangut, Defendant Oliveira and other GDMHA staff made this
assumption based on the status of Mr. Bolmer as a person with mental illness.

31.    Because Mr. Bolmer is a person with mental illness, Defendant Sangut,
Defendant Oliveira and other GDMHA staff assumed his statements were inherently
inaccurate, unreliable, and not to be believed or credited.

6

32.   Defendant Sangut, Defendant Oliveira and other GDMHA staff therefore assumed his statements were symptoms of a delusion that warranted immediate clinical intervention.

33.   Sometime around noon on September 14th, Mr. Bolmer received a telephone call from his probation officer ordering him to report to the GDMHA office.

34.   The probation officer further informed Mr. Bolmer that his probation would be revoked if he failed to appear at the GDMHA office.

35.   Mr. Bolmer was on probation as a result of a misdemeanor charge arising out of a conflict with his brother.

36.   Shortly thereafter on September 14th, Mr. Bolmer arrived at the central office of GDMHA.  He entered the conference room to find numerous GDMHA employees waiting in the room, including Defendant's Oliveira, and Defendant Sangut.

37.   Moments after sitting down, Mr. Bolmer met defendant Joseph Oliveira, M.D., who told Mr. Bolmer that he needed to perform a "mini-mental examination."

38.   The "mini-mental examination" consisted of a few questions regarding Mr. Bolmer's mood and a request for him to repeat certain phrases including "motor tree giraffe."

39.   Mr. Bolmer cooperated with this demand, while expressing his concern regarding why he was being asked to take a "mini-mental examination."  No explanation was given to Mr. Bolmer regarding the rationale for a "mini-mental examination."

40.   Defendant Oliveira's "examination" of the plaintiff lasted approximately two minutes.

7

41.     Following the "mini-mental examination", Defendant Oliveira certified

Mr. Bolmer for involuntary hospitalization by executing a Physician's Emergency

Certificate ("PEC "). The execution of the PEC by defendant Oliveira ultimately resulted

in Mr. Bolmer's involuntary transport and commitment to Danbury Hospital.

42.     Within approximately one minute after defendant Oliveira completed his

"mini-mental examination" police officers and emergency medical service ("EMS")

personnel entered the conference room.

43.     At this point, it became clear to Mr. Bolmer that he was not free to leave

the conference room at GDMHA.

44.     Upon information and belief, Defendant Oliveira instructed Defendant

Sangut to call police officers and EMS personnel to the GDMHA office prior to Mr.

Bolmer's "mini-mental examination" in anticipation of his involuntary hospitalization.

45.     When confronted with the police officers, Mr. Bolmer stated that he would

sue everyone for the mistreatment that he was receiving.

46.     When police, Defendant Sangut, Defendant Oliveira and other GDMHA

personnel told Mr. Bolmer to "calm down," Mr. Bolmer emphasized that he was calm

and that he could not understand why GDMHA called police or EMS.

47.     Mr. Bolmer cooperated fully with ambulance personnel and required no

restraint when he was informed that he was being taken to Danbury Hospital.

48.     At no time did Mr. Bolmer engage in, or threaten to engage in, any acts of

physical harm to himself or any other person

49.     At no time did Mr. Bolmer engage in aggressive behavior.

50.     At no time did Mr. Bolmer attempt, or threaten to attempt suicide.

8

51.     At no time did a clinician determine that Mr. Bolmer was suicidal at the time of this incident.

52.     Mr. Bolmer was able to meet his essential needs of food, clothing, shelter and the provision of medical care.

53.     Mr. Bolmer did not pose a danger to himself or others at anytime during the incident at the GDMHA office, or at any time leading to his involuntary hospitalization.

54.     Police and EMS personnel transported Mr. Bolmer to Danbury Hospital where Defendant Dekeyser admitted Mr. Bolmer.

55.     Danbury Hospital staff relied upon the clinical assessment by defendant Oliveira when admitting Mr. Bolmer involuntarily as no independent assessment of the need for involuntary hospitalization was made by a Danbury Hospital physician prior to admission.

56.     At or about 4:40, defendant Estaba concluded that while Mr. Bolmer made statements of a delusional and paranoid nature, he was clinically stable.

57.     Nevertheless, in order to ensure that Mr. Bolmer did not pose a threat of harm to any individual, defendant Establa wrote an order placing Mr. Bolmer in seclusion.

58.     At the time of the order, Mr. Bolmer was upset about being hospitalized against his will, but did not in anyway pose a threat of safety to anyone in the hospital

59.     Nevertheless, hospital staff placed Mr. Bolmer in seclusion, where he remained past 9:00 P.M.

60.     The placement of Mr. Bolmer in restraint eliminated any conceivable threat of harm that staff could have believed Mr. Bolmer might pose.

61.     At 5:15 P.M., Defendant DeKeyser ordered an oral dose of Geodon for Mr. Bolmer.  Geodon is a psychotropic drug that impacts on a person's mental state.

62.     Also at 5:15 P.M., Defendant DeKeyser wrote an additional order in which she authorized hospital staff to administer Geodon over the objection of Mr. Bolmer by means of injection if Mr. Bolmer refused an oral dose of Geodon.

63.     Defendant DeKeyser did not limit the circumstances under which hospital staff could administer medication over objection.

64.     Hence, defendant DeKeyser authorized hospital staff to administer medication against Mr. Bolmer's will under circumstances other than when Mr. Bolmer was manifesting a condition of an extremely critical nature and posing a threat to the safety of either himself or others.

65.     At or about 5:35 P.M., while Mr. Bolmer remained in restraint, hospital staff offered Mr. Bolmer an oral dose of Geodon.

66.     Mr. Bolmer refused the medication.

67.     At this point, hospital staff decided to administer Geodon over objection.

68.     Mr. Bolmer became more upset stating that he wanted to leave the hospital and intended to sue the hospital.

69.     In response to Mr. Bolmer's statements, hospital staff not only administered Geodon over objection but placed Mr. Bolmer in four point restraint.

70.     The placement of Mr. Bolmer in restraint was done pursuant to on order written by defendant Estaba that authorized such action.

10

71.    The order authorizing the placement of Mr. Bolmer in restraint did not limit the use of restraint to circumstances only when Mr. Bolmer was posing an imminent danger to himself or others.

72.    Pursuant to the order written by defendant DeKeyser detailed in paragraphs 61 through 63, hospital staff administered Geodon over objection by injection at the same time it placed Mr. Bolmer in restraint.

73.    Because hospital staff had placed Mr. Bolmer in restraint and seclusion at the time staff administered Geodon over objection, under no conceivable circumstances was Geodon necessary to protect against any threat to safety posed by Mr. Bolmer.

74.    Hence, staff administered Geodon over objection only because it was determined that Mr. Bolmer's clinical condition warranted this medication.

75.    At the time hospital staff administered Geodon, although Mr. Bolmer was upset at finding himself locked in a hospital and had threatened to sue the hospital, he was not acting in a dangerous manner, threatening to act in a dangerous manner, or posing any conceivable threat to safety of himself or others.

76.    In addition, Mr. Bolmer was not manifesting a psychiatric condition of an extremely critical nature.

77.    Mr. Bolmer remained in four point restraints for approximately two hours. Hospital staff then kept Mr. Bolmer in three point restraints and then two point restraints. Eventually, hospital staff removed all restraints.

78.    Defendant Pellerin was Mr. Bolmer's treating physician during his confinement at Defendant Danbury Hospital.

79.     As Mr. Bolmer's treating physician, Defendant Pellerin possessed the authority to release Mr. Bolmer.

80.     Mr. Bolmer requested his release at least once a day.  Nevertheless, defendant Pellerin kept Mr. Bolmer confined.

81.     Mr. Bolmer was not free to leave the hospital at any time until Defendant Pellerin ordered his discharge on September 16, 2004.

82.     Throughout his period of confinement, although Mr. Bolmer remained angry about his hospitalization, he did not lack impulse control and did not intend to harm anyone physically.

83.     Nevertheless, defendant Pellerin and other clinical staff misinterpreted Mr. Bolmer's anger about his wrongful confinement as a symptom of dangerousness.

84.     During Mr. Bolmer's hospitalization, Defendant Pellerin wrote that Mr. Bolmer "perseverated over the idea of having a relationship with [Ms. Kaminski] at THP, and he frequently stated that they had a relationship for quite a while and that once he told GDMHA, he was hospitalized, which he does not understand because it is true."

85.     Defendant Pellerin assumed, however, that because Mr. Bolmer had a history of mental illness he was engaged in "grandiose delusions of having a relationship with this woman".

86.     Neither Defendant Pellerin, DeKeyser, nor Estaba took steps to ascertain whether Mr. Bolmer and Lisa Kaminski had been involved in a sexual relationship.

87.     Additionally, the document entitled Danbury Hospital History and Physical Examination states that Mr. Bolmer had been "stalking a female THP worker."

12

88.     Neither Defendants Pellerin, Dekeyser nor Estaba investigated whether Mr. Bolmer in fact stalked Ms. Kaminski.

89.     Defendants Pellerin, Dekeyser or Estaba chose to believe the statements of GDMHA personnel rather than Mr. Bolmer because he was a person with a history of mental illness and because he was reported by GDMHA to be delusional.

90.     Defendant Pellerin relied on second hand remarks from Defendant Oliveira that accused Mr. Bolmer of "attempting to call [Ms. Kaminski] and placing flowers on [Ms. Kaminski's] car."

91.     Defendant Pellerin made no attempt to determine whether Mr. Bolmer was actually engaged in the relationship.

92.     Because Mr. Bolmer was a person with a history of mental illness, Defendants Pellerin, Dekeyser, Estaba and other Danbury Hospital staff assumed his statements were inherently inaccurate, unreliable, and not to be believed. Defendant's Pellerin, DeKeyser and Estaba therefore assumed his statements were symptoms of "delusions of grandeur."

93.     Defendants Pellerin, Dekeyser and Estaba failed to follow standard medical practices in general, and standard psychiatric treatment practices in particular, because they did not gather or consider a complete history from Mr. Bolmer upon his arrival.

94.     Defendants Pellerin, Dekeyser and Estaba instead relied on second hand remarks from Defendant Oliveira and assumptions based on stereotypes of persons with mental illness.

95.     Defendants Pellerin, Dekeyser and Estaba failed to follow standard medical practices in general, and standard psychiatric treatment practices in particular, when they refused to accept as true  Mr. Bolmer's statements about his relationship with Ms. Kaminski.

96.     Defendants Pellerin, Dekeyser and Estaba refused to accept these statements as true because Mr. Bolmer was a person with a history of mental illness.

97.     Defendants Pellerin, Dekeyser and Estaba further failed to follow standard medical practices in general, and standard psychiatric treatment practices in particular, when they made no attempt to investigate whether Mr. Bolmer's statements were, in fact, true.

98.     Defendants Pellerin, DeKeyser and Establa failed to take such action because Mr. Bolmer was a person with a history of mental illness.

99.     On September 16, 2004, defendant Pellerin authorized Mr. Bolmer's discharge from Danbury Hospital.

100.    GDMHA conducted an investigation of Ms. Kaminski in response to a Client Rights Officer's Investigation Report issued on October 26, 2004 in response to Mr. Bolmer's complaint.

101.    The GDMHA investigation ultimately resulted in GDMHA terminating Ms. Kaminski for misconduct related to her sexual relationship with Mr. Bolmer.

## VI. STATEMENT OF FACTS DEMONSTRATING STATE ACTION BY DANBURY HOSPITAL

102.    Until the mid 1990s, DMHAS operated a comprehensive state-wide psychiatric system in which it provided out-patient care and acute in-patient care.

14

103.    DMHAS also operated a system of out-patient care with services provided by local mental health authorities.

104.    The provision of acute in-patient care included assessments to determine whether or not a mentally ill person satisfied the criteria for civil commitment, i.e., involuntary hospitalization.

105.    Subsequent to the closure of two of the three state psychiatric hospitals in the mid 1990s, DMHAS decided that it would continue to provide out-patient care and in-patient care to chronic mentally ill individuals.  However, DMHAS decided that it would recruit local hospitals, including private hospitals, to provide acute in-patient care.

106.    As a result, DMHAS and local hospitals now operate a detailed system that involves extensive collaboration between DMHAS operated facilities and local hospitals that provide acute care.

107.    For instance, when clinicians at a state operated out-patient facility determine that the condition of a mentally ill out-patient has changed to the extent that in-patient care is required, the state operated out-patient facility will transfer the mentally ill person to a local hospital to provide acute in-patient psychiatric services deemed necessary by state operated providers of out-patient services.

108.    Danbury Hospital is one facility that DMHAS has recruited to provide acute in-patient care.

109.    Upon information and belief, as a result of the recruitment of Danbury Hospital to provide acute in-patient services, Danbury Hospital made a number of changes in its practices to facilitate the provision of acute in-patient care.

110.    For instance, upon information and belief, prior to the decision of DMHAS to recruit Danbury Hospital to provide acute in-patient care, Danbury Hospital did not have locked wards.

111.    Locked wards are necessary for the provision of acute in-patient care.

112.    Danbury Hospital now maintains locked psychiatric wards for the provision of acute in-patient care.

113.    Likewise, upon information and belief, Danbury Hospital maintains a number of beds to be used for patients who would have been in the past provided acute services by DMHAS.

114.    Doctors employed at, or by, local hospitals that provide acute in-patient care, including defendants DeKeyser and Estaba, participate in the collaborative treatment program between DMHAS and local hospitals detailed in paragraph ___.

115.    DMHAS maintains control and supervision of the level of care provided by acute care providers through contracts in which DMHAS pays extensive amounts of money for the provision of acute care services while, in these contracts, requiring local hospitals to allocate treatment resources in a manner satisfactory to DMHAS.

116.    Danbury Hospital has maintained a long-standing contractual relationship with DMHAS to provide psychiatric health care services to DMHAS clients under standards closely regulated by DMHAS. Danbury Hospital's conduct in the course of Mr. Bolmer's involuntary commitment occurred while Danbury Hospital was acting in the scope of its contractual obligations to DMHAS.

16

117.   The relevant contract between DMHAS and Danbury Hospital covering the time of Mr. Bolmer's involuntary hospitalization was entered into on July 1, 2003 with an expiration date of June 30, 2005.

118.   DMHAS paid Danbury Hospital over $3,000,000 (three million dollars) during the contract term for provision of psychiatric health care services to DMHAS clients pursuant to a "Human Service Contract." Over $864,000 (Eight Hundred and sixty four thousand dollars) of that funding was set aside for psychiatric crisis intervention services. Approximately $324,000 (Three Hundred and twenty four thousand dollars) of Danbury Hospital's funding under the contract was Federal money.

119.   The "Human Service Contract" between Danbury Hospital and DMHAS addressed not only the financial relationship between the entities, but also authorized DMHAS to monitor Danbury Hospital's performance in the provision of its psychiatric services via both monthly and annual reporting.

120.   The "Human Service Contract" contained a "Quality Assurance" clause that required Danbury Hospital to comply with all pertinent provisions of local, state, and federal laws as well as regulations of Connecticut State Agencies in the course of providing psychiatric health care services to DMHAS clients.

121.   The "Human Service Contract" also required that Danbury Hospital maintain client "Grievance Procedures", managed by a Client Rights Officer, under a model acceptable to DMHAS, for purposes of addressing complaints of DMHAS clients receiving services under the contract.

122.   The "Human Service Contract" between Danbury Hospital and DMHAS required Danbury Hospital to provide DMHAS with client-specific data and service

information for purposes of evaluating and monitoring Danbury Hospital's performance in the provision of acute care services.

123.   Upon information and belief, the "Human Service Contract" between Danbury Hospital and DMHAS required Danbury Hospital to serve DMHAS clients from the geographical area that DMHAS designated Danbury Hospital to cover when it recruited local hospitals to provide acute in-patient services.

124.   The "Human Service Contract" between Danbury Hospital and DMHAS required that the hospital's programs and services comply with Section 504 of the Rehabilitation Act.

## VII. LEGAL ALLEGATIONS

### First Cause of Action

125.   Paragraphs 1 through 122 are incorporated by reference.

126.   By facilitating and authorizing the involuntary detention and transportation in the absence of probable cause to believe that Mr. Bolmer satisfied the criteria for involuntary hospitalization, Defendants Sangut and Oliveira violated the Fourth and Fourteenth amendments to the United States Constitution and further violated 42 U.S.C. § 1983.

### Second Cause of Action

127.   Paragraphs 1 through 122 are incorporated by reference.

128.   By authorizing the involuntary admission and continued hospitalization of Mr. Bolmer when he did not pose a danger to himself or others, defendants Oliveira, Dekeyser, and Pellerin violated the substantive component of the Due Process Clause of the Fourteenth Amendment and further violated 42 U.S.C. § 1983.

### Third Cause of Action

129. Paragraphs 1 through 122 are incorporated by reference.

130. By authorizing the forcible administration of medication to Mr. Bolmer when he did not manifest a condition of an extremely critical nature and did not pose a threat to the safety of either himself or any other patient, which resulted in hospital staff administering medication over objection when Mr. Bolmer did not manifest a condition of an extremely critical nature and did not pose a threat to the safety of either himself or any other patient, defendant DeKeyser violated the substantive component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and further violated 42 U.S.C. § 1983.

### Fourth Cause of Action

131. Paragraphs 1 through 122 are incorporated by reference.

132. By authorizing the forcible administration of medication to Mr. Bolmer when he did not manifest a condition of an extremely critical nature and did not pose a threat to the safety of either himself or any other patient, which resulted in hospital staff administering medication over objection absent a determination that Mr. Bolmer was manifesting a condition of an extremely critical nature and posing a threat to the safety of either himself or another patient, defendant DeKeyser violated the procedural component of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and further violated 42 U.S.C. § 1983.

### Fifth Cause of Action

133. Paragraphs 1 through 122 are incorporated by reference.

19

134.    By authorizing hospital staff to place Mr. Bolmer in restraints when Mr.

Bolmer did not pose a threat of imminent danger to either himself or others, which

resulted in hospital staff placing Mr. Bolmer in restraint when he was not posing a threat

of imminent danger to himself or others, defendant Estaba violated the substantive

component of the Due Process Clause of the Fourteenth Amendment to the United States

Constitution and further violated 42 U.S.C. § 1983.

### Sixth Cause of Action

135.    Paragraphs 1 through 122 are incorporated by reference

136.    By authorizing hospital staff to place Mr. Bolmer in restraints when Mr.

Bolmer in the absence of a determination that Mr. Bolmer posed a threat of imminent

danger to himself or others, defendant Estaba violated the procedural component of the

Due Process Clause of the Fourteenth Amendment to the United States Constitution and

further violated 42 U.S.C. § 1983.

### Seventh Cause of Action

137.    Paragraphs 1 through 122 are incorporated by reference.

138.    By assuming that Mr. Bolmer's allegations about his sexual relationship

were false and in so doing, stereotyping Mr. Bolmer as an unreliable individual who

manifested delusions because of his diagnosed mental illness, defendant DMHAS

violated Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.

### Eighth Cause of Action

139.    Paragraphs 1 through 122 are incorporated by reference.

140.   By assuming that Mr. Bolmer's allegations about his sexual relationship were false because he is an individual with a mental illness and thereby subjecting him to wrongful confinement, forced medication and restraints, defendant Danbury Hospital discriminated against Mr. Bolmer in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

### Pendant State Claims

### Ninth Cause of Action

141.   Paragraphs 1 through 122 are incorporated by reference.

142.   By confining the plaintiff when he was not gravely disabled or otherwise a danger to himself, defendants Oliveira, Pellerin and Danbury falsely imprisoned Mr. Bolmer.

### Tenth Cause of Action

143.   Paragraphs 1 through 122 are incorporated by reference.

144.   By authorizing the forcible administration of medication to Mr. Bolmer when he did not manifest a condition of an extremely critical nature and did not pose a threat to the safety of either himself or any other patient, defendants DeKeyser and Danbury committed a battery against Mr. Bolmer.

### Eleventh Cause of Action

145.   Paragraphs 1 through 122 are incorporated by reference.

146.   By authorizing hospital staff to place Mr. Bolmer in restraints, when he did not pose a threat of imminent danger to either himself or others, defendants Estaba and Danbury committed a battery against Mr. Bolmer.

## VIII.  REQUESTS FOR RELIEF

WHEREFORE, the plaintiff seeks the following relief:

A.     A jury trial;

B.     Compensatory damages in an amount to be determined at trial

C.     Punitive damages in an amount to be determined at trial;

D.     Attorneys fees pursuant to 42 U.S.C. §§ 1988, 42 U.S.C. § 12205 and 29 U.S.C.

        § 794a(b);

E.     Costs and disbursements; and

F.     Any other relief that this Court deems just and proper.


                                        Respectfully Submitted,


                                        By:_____/s/_____
                                        AJAZ FIAZUDDIN
                                        Fed. Bar. No. CT27001
                                        ajaz.fiazuddin@po.state.ct.us
                                        NANCY B. ALISBERG
                                        Fed. Bar. No. CT 21321
                                        nancy.alisberg@po.state.ct.us
                                        Office of Protection and Advocacy
                                        For Persons with Disabilities
                                        60B Weston Street
                                        Hartford, CT 06120
                                        Tel: (860) 297-4330
                                        Fax:  (860) 566-8714


                                        THOMAS BEHRENDT
                                        Connecticut Legal Rights Project
                                        Silver Street, P.O. Box 351
                                        Middletown, CT  06457
                                        Fed. Bar No. CT13648
                                        (860)-262-5030
                                        Fax: (860) 262-5035
                                        tbehrendt@clrp.org

KARYL LEE HALL
Fed. Bar. No. ct19320
Connecticut Legal Rights Project
Silver Street, P.O. Box 351
Middletown, CT 06457
(860) 262-5044
Fax: (860) 262-5035
klhall@clrp.org

WILLIAM M. BROOKS
PHV 0930
Touro College Law Center
300 Nassau Road
Huntington, New York  11743
631-421-2244
Fax: 631-423-2040
williamb@tourolaw.edu

Dated at Hartford, Ct.
July 20, 2007
Attorneys for Brett Bolmer

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2007, a copy of the foregoing Plaintiff's Third Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System

By:_____/s/_____
AJAZ FIAZUDDIN
Fed. Bar. No. CT27001
ajaz.fiazuddin@po.state.ct.us
Office of Protection and Advocacy
For Persons with Disabilities
60B Weston Street
Hartford, CT  06120
(860) 297-4338
Fax:  (860) 566-8714


Joyce A. Lagnese (ct05527)
Michael McPherson (ct)
DANAHER, LAGNESE & NEAL, P.C.
21 Oak Street; Capitol Place, Suite 700
Hartford, CT  06106
Phone (860) 247-3666
Facsimile (860) 547-1321

Emily V. Melendez (ct21411)
State of Connecticut
Assistant Attorney General
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel:  (860) 808-5210
Fax: (860)-808-5385

**Defendants' Exhibit B**
**Answer State Defendants Third Amended Complaint**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRETT BOLMER | : | CIVIL ACTION |
| *Plaintiff* | : | NO. 3:06 CV 235 (JBA) |
| | : | |
| v. | : | |
| | : | |
| JOSEPH OLIVERIA, M.D., | : | |
| MALENA SANGUT, | : | |
| DIANE DEKEYSER, M.D., | : | |
| VICTOR ESTABA, M.D., | : | |
| DONNA PELLERIN, M.D., | : | |
| CONNECTICUT DEPARTMENT | : | |
| OF MENTAL HEALTH AND | : | |
| ADDICTION SERVICES, and | : | |
| DANBURY HOSPITAL | : | |
| *Defendants* | : | OCTOBER 5, 2007 |

## ANSWER AND AFFIRMATIVE DEFENSES TO THIRD AMENDED COMPLAINT

The defendants, Joseph Oliveria, M.D., Malena Sangut, and the Connecticut Department of Mental Health and Addiction Services ("DMHAS"), hereby submit their answer and affirmative defenses to the Plaintiff's Third Amended Complaint, dated July 20, 2007.

### I.  INTRODUCTORY STATEMENT

Admit the allegations of the introductory statement only insofar as they allege that the plaintiff has brought this action against the defendants.  Deny the remaining allegations of the introductory statement.

### II.  PARTIES

1. Admit that the Plaintiff is a person with psychiatric disabilities, deny remainder of paragraph 1.

2.   Admit that Dr. Oliveria is licensed as a psychiatrist by the State of Connecticut and that on September 14, 2004 he was employed by Greater Danbury Mental Health Authority ("GDMHA").

3.   Admit paragraph 3.

4.   Admit paragraph 4.

5.   Admit paragraph 5.

6.   Admit paragraph 6.

7.   Admit that DMHAS is an agency of the State of Connecticut which provides mental health and addiction services.  Admit that GDMHA is an agency of DMHAS located in Danbury, Connecticut.  Deny the remaining allegations contained in paragraph 7.

8.   Admit that Danbury Hospital is a private hospital located in Danbury, Connecticut and that it offers psychiatric services.  Deny for lack of sufficient information or knowledge the remainder of paragraph 8 and therefore leave said allegations to the Plaintiff's proof.

### III.  JURISDICTION AND VENUE

9.   Admit the allegations of paragraph 9 only insofar as they reflect the plaintiff's attempts to invoke this Court's jurisdiction.

10.   Admit the allegations of paragraph 10 only insofar as they reflect the plaintiff's attempts to invoke this Court's jurisdiction.

### IV.  RELEVANT STATUTORY SCHEME

11.   Admit paragraph 11 to the extent it contains language contained in the United States Code.

12. Admit paragraph 12 to the extent it contains language contained in the United States Code.

## V. STATEMENT OF FACTS

13. Deny paragraph 13.

14. Admit that the Plaintiff is a person with psychiatric disabilities, deny remaining portions of paragraph 14.

15. Deny paragraph 15 as to defendants Dr. Oliveria, Sangut and DMHAS. Deny paragraph 15 for lack of sufficient information or knowledge as to defendants Dr. Pellerin, Dr. DeKeyser, Dr. Estaba and Danbury Hospital and therefore, leave said allegations to the Plaintiff's proof.

16. Admit that the Plaintiff was a DMHAS client, deny for lack of sufficient information or knowledge the remainder of paragraph 16 and therefore leave said allegations to the Plaintiff's proof.

17. Admit that Lisa Kaminski worked in the Transitional Housing Program at GDMHA, Deny remaining allegations in paragraph 17.

18. Deny paragraph 18 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

19. Deny paragraph 19 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

20. Admit paragraph 20.

21. Admit that the Plaintiff spoke with Mr. Hammond. Deny the remaining portions of paragraph 21.

22.  Admit that the Plaintiff went to the GDMHA offices and met with Mr. Anello.  Deny the remaining portions of paragraph 22 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

23.  Admit that the Plaintiff spoke with Mr. Anello regarding Ms. Kaminski.  Deny the remaining portions of paragraph 23 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

24.  Admit that Mr. Anello asked the Plaintiff to wait.  Deny the remaining allegations contained in paragraph 24.

25.  Admit that Mr. Bolmer left the GDMHA without further discussion with Mr. Anello. Deny the remainder of paragraph 25 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

26.  Admit that Ms. Kaminski informed her supervisor at GDMHA that the Plaintiff had left a message on her voicemail that contained lewd statements.  Deny the remaining allegations contained in paragraph 26.

27.  Deny paragraph 27 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

28.  Deny paragraph 28.

29.  Deny paragraph 29.

30.  Deny paragraph 30.

31.  Deny paragraph 31.

32.  Deny paragraph 32.

33.  Deny paragraph 33 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

4

34. Deny paragraph 34.

35. Deny paragraph 35.

36. Admit that on September 14, 2004 the Plaintiff came to GDMHA and entered a conference room. Deny the remaining allegations contained in paragraph 36.

37. Admit that Dr. Oliveria told the Plaintiff that he would be conducting a mental examination. Deny remaining allegations contained in paragraph 37.

38. Deny paragraph 38.

39. Deny paragraph 39.

40. Deny paragraph 40.

41. Admit that after conducting his examination that Dr. Oliveria executed a PEC for the Plaintiff to go to Danbury Hospital for further evaluation. Deny the remaining allegations contained in paragraph 41.

42. Deny paragraph 42.

43. Deny paragraph 43.

44. Deny paragraph 44.

45. Deny paragraph 45 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

46. Deny paragraph 46.

47. Admit that the Plaintiff required no restraint. Deny remaining allegations contained in paragraph 47 for lack of insufficient information and therefore, leave said allegations to the Plaintiff's proof.

48. Deny paragraph 48.

49. Deny paragraph 49.

5

50. Admit.

51. Admit.

52. Deny paragraph 52.

53. Deny paragraph 53.

54. Admit that EMS personnel transported Mr. Bolmer to Danbury Hospital.  Deny remainder of paragraph 54.

55. Deny paragraph 55.

56. Deny paragraph 56.

57. Deny paragraph 57 for lack of sufficient information or  knowledge and therefore, leave said allegations to the Plaintiff's proof.

58. Deny paragraph 58 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

59. Deny paragraph 59 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

60. Deny paragraph 60 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

61. Admit paragraph 61.

62. Deny paragraph 62 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

63. Deny paragraph 63 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

64. Deny paragraph 64 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

6

65. Deny paragraph 65.

66. Admit that Plaintiff refused medication.

67. Deny paragraph 67.

68. Deny paragraph 68 for lack of sufficient information and therefore, leave said allegations to the Plaintiff's proof.

69. Deny paragraph 69.

70. Deny paragraph 70 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

71. Deny paragraph 71 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

72. Deny paragraph 72 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

73. Deny paragraph 73 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

74. Deny paragraph 74 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

75. Deny paragraph 75 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

76. Deny paragraph 76 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

77. Deny paragraph 77 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

78. Deny paragraph 78 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

79. Deny paragraph 79 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

80. Deny paragraph 80 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

81. Deny paragraph 81 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

82. Deny paragraph 82 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

83. Deny paragraph 83 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

84. Admit paragraph 84.

85. Deny paragraph 85 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

86. Deny paragraph 86 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

87. Deny paragraph 87 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

88. Deny paragraph 88 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

89. Deny paragraph 89 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

8

90. Deny paragraph 90 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

91. Deny paragraph 91 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

92. Deny paragraph 92 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

93. Deny paragraph 93 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

94. Deny paragraph 94 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

95. Deny paragraph 95 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

96. Deny paragraph 96 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

97. Deny paragraph 97 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

98. Deny paragraph 98 for lack of sufficient information or knowledge and therefore, leave said allegations to the Plaintiff's proof.

99. Admit paragraph 99.

100. Admit that GDMHA conducted an investigation of Lisa Kaminski. Deny remaining allegations contained in paragraph 100.

101. Admit Ms. Kaminski ended employment with GDMHA based upon its investigation. Deny remaining portions of paragraph 101.

9

## VI.  STATEMENT OF FACTS DEMONSTRATING STATE ACTION BY DANBURY HOSPITAL

102.  Deny paragraph 102.

103.  Deny paragraph 103.

104.  Deny paragraph 104.

105.  Deny paragraph 105.

106.  Deny paragraph 106.

107.  Deny paragraph 107.

108.  Deny paragraph 108.

109.  Deny paragraph 109.

110.  Deny paragraph 110.

111.  Admit paragraph 111.

112.  Admit that Danbury Hospital maintains a locked psychiatric ward.  Deny remaining allegations contained in paragraph 112.

113.  Deny paragraph 113.

114.  Deny paragraph 114.

115.  Deny paragraph 115.

116.  Admit that DMHAS and Danbury Hospital have had a contractual relationship. Deny remaining allegations contained in paragraph 116.

117.  Admit paragraph 117.

10

118. Admit that DMHAS had a contract with Danbury Hospital for the provision of various mental health and addiction services and that said contract sets forth those terms. Deny remaining portions of paragraph 118.

119. Admit that DMHAS had a contract with Danbury Hospital for the provision of various mental health and addiction services and that said contract sets forth those terms. Deny remaining portions of paragraph 119.

120. Admit that DMHAS had a contract with Danbury Hospital for the provision of various mental health and addiction services and that said contract sets forth those terms. Deny remaining portions of paragraph 120.

121. Admit that DMHAS had a contract with Danbury Hospital for the provision of various mental health and addiction services and that said contract sets forth those terms. Deny remaining portions of paragraph 121.

122. Admit that DMHAS had a contract with Danbury Hospital for the provision of various mental health and addiction services and that said contract sets forth those terms. Deny remaining portions of paragraph 122.

123. Admit that DMHAS had a contract with Danbury Hospital for the provision of various mental health and addiction services and that said contract sets forth those terms.

124. Admit that DMHAS had a contract with Danbury Hospital for the provision of various mental health and addiction services and that said contract sets forth those terms. Deny remaining portions of paragraph 124

### VII.  LEGAL ALLEGATIONS

First Cause of Action

125. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

11

126. Deny paragraph 126.

<u>Second Cause of Action</u>

127. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

128. Deny paragraph 128 as to Dr. Oliveria. Deny for lack of sufficient information or knowledge as to Dr. Dekeyser and Dr. Pellerin and leave the Plaintiff to his proof.

<u>Third Cause of Action</u>

129. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

130. Deny paragraph 130 for lack of sufficient information or knowledge and leave the Plaintiff to his proof.

<u>Fourth Cause of Action</u>

131. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

132. Deny paragraph 132 for lack of sufficient information or knowledge and leave the plaintiff to his proof.

<u>Fifth Cause of Action</u>

133. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

134. Deny paragraph 134 for lack of sufficient information or knowledge and leave the plaintiff to his proof.

<u>Sixth Cause of Action</u>

135. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

136. Deny paragraph 135 for lack of sufficient information or knowledge and leave the plaintiff to his proof.

<u>Seventh Cause of Action</u>

137. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

12

138. Deny paragraph 138.

Eighth Cause of Action

139. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

140. Deny paragraph 140 for lack of sufficient information or knowledge and leave the plaintiff to his proof.

Ninth Cause of Action

141. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

142. Deny paragraph 141 as to Defendant Oliveria, deny for lack of sufficient information or knowledge as to Defendant Pellerin and Danbury Hospital.

Tenth Cause of Action

143. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

144. Deny paragraph 144 for lack of sufficient information or knowledge and leave plaintiff to his proof.

Eleventh Cause of Action

145. Defendants incorporate the responses to paragraph 1-122 as set forth herein.

146. Deny paragraph 146 for lack of sufficient information or knowledge and leave the plaintiff to his proof.

## **AFFIRMATIVE DEFENSES**

### FIRST DEFENSE

The Plaintiff's claims against the defendant Department of Mental Health and Addiction Services are barred by the Eleventh Amendment to the United States Constitution.

13

## SECOND DEFENSE

The Plaintiff's claims contained in the First and Second Causes of Action against defendant Dr. Oliveria in his individual capacity are barred by the doctrine of qualified immunity.

## THIRD DEFENSE

The Plaintiff's false imprisonment claim contained in the Ninth Cause of Action against defendant Dr. Oliveria in his individual capacity are barred by the immunity provisions of Conn. Gen. Stat. § 4-165.

## FOURTH DEFENSE

The Plaintiff's claims against defendant Malena Sangut in her individual capacity are barred by the doctrine of qualified immunity.

## FIFTH DEFENSE

The Plaintiff's Third Amended Complaint fails to state a claim against defendant's Oliveria, Sangut, and DMHAS upon which relief can be granted.

## SIXTH DEFENSE

The Plaintiff's claims against unnamed GDMHA staff fail to state a claim upon which relief can be granted.

## SEVENTH DEFENSE

The Plaintiff's own actions constitute a superseding and/or intervening cause of the injuries that form the basis of this action.

## EIGHTH DEFENSE

The Plaintiff failed to mitigate his damages.

14

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:     _____

Emily V. Melendez
Assistant Attorney General
Federal Bar No. ct 21411
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5210
Fax: (860) 808-5385
Emily.Melendez@po.state.ct.us

## CERTIFICATE OF SERVICE

I hereby certify that on  October 5, 2007, a copy of the foregoing Answer and Affirmative

Defenses was filed electronically.  Notice of this filing will be sent by e-mail to all parties by

operation of the Court's electronic filing system.  Parties may access this filing through the

Court's CM/ECF system.


Emily V. Melendez
/s/_____

Emily V. Melendez
Assistant Attorney General
Federal Bar No. ct21411
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel:  (860) 808-5210
Fax: (860) 808-5385
Email: Emily.Melendez@po.state.ct.us