# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

**BRETT BOLMER,**
    *Plaintiff,*

    *v.*

**No. 06-cv-235 (JBA)**

**JOSEPH OLIVEIRA, DIANE DeKEYSER, VICTOR ESTABA, DONNA PELLERIN, CONN. DEP'T OF MENTAL HEALTH AND ADDICTION SERVS., and DANBURY HOSPITAL**
    *Defendants.*

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Brett Bolmer commenced this action in 2006, challenging his temporary involuntary commitment, physical restraint, and involuntary injection with medication at Danbury Hospital in 2004. Mr. Bolmer has asserted a variety of Constitutional, statutory, and common law tort claims against the defendants, who now move for summary judgment on all claims. For the reasons set forth below, the State defendants' motion for summary judgment will be denied, and the Danbury Hospital defendants' motion for summary judgment will be granted in part and denied in part.

## I.    Facts and Background

### Mental health services in the Danbury, Connecticut area

Both the State of Connecticut and private organizations have historically provided care for the mentally ill, and, prior to the 1980's, the State operated a number of mental health

hospitals for the benefit of the public. Beginning in the 1980's, however, the State of Connecticut began moving towards a model of psychiatric care which sought to integrate individuals suffering from psychiatric disorders into their local communities, rather than restricting such individuals to lives of confinement in public psychiatric hospitals. As part of this shift in care, the State closed a number of its psychiatric hospitals and began providing outpatient services in Connecticut towns and cities aimed at providing individuals with psychiatric disabilities with ongoing support and treatment. In approximately 1995, the State closed the Fairfield Hills Hospital located in Newtown, just outside of Danbury, and began providing outpatient services through the Greater Danbury Mental Health Authority ("GDMHA"), which is a local agency of the Connecticut Department of Mental Health and Addiction Services ("DMHAS").

In addition to providing outpatient services, DMHAS made arrangements to care for DMHAS patients ("clients," in the parties' parlance) in need of emergency psychiatric care. To this end, DMHAS contracts with private hospitals around Connecticut to evaluate and care for DMHAS clients. In the Danbury area, such emergency services are provided under contract by Danbury Hospital, a privately owned and operated institution which has an acute psychiatric inpatient unit in which it treats both privately insured patients and DMHAS clients. In response to concerns about private hospitals being financially overburdened by the costs of treatment services for DMHAS clients, the State provides some private hospitals, including Danbury Hospital, with grants to offset these costs.

The parties are in agreement that Danbury Hospital chose to contract with DMHAS to

provide inpatient services, and that the Hospital runs its psychiatric care program "without any state mandate or involvement."[1]  Although DMHAS periodically assesses the mental health services provided by contracting private organizations and provides for quality assurance measures in its contract with Danbury Hospital, DMHAS's oversight is aimed "at quality assurance and not the direct operations or provision of treatment" at private facilities.[2]  Under the contract between DMHAS and Danbury Hospital, the latter is neither required to set aside beds in its psychiatric unit for DMHAS clients, nor obligated to treat DMHAS clients.

**The Events of September 13-16, 2004**

During the relevant time period, Mr. Bolmer was a resident of Danbury who suffered from a psychiatric disability and who lived in the GDMHA's Transitional Housing Program (THP), which provides temporary housing for GDMHA clients.  As part of the program, Mr. Bolmer was assigned a case manager, Lisa Kaminski, whose duties included assisting in the plaintiff's treatment.[3]  Kaminski and Bolmer had known each other prior to meeting at THP, as they had both grown up in Newtown, Connecticut in the late 1970s, and periodically socialized following their graduation from high school.

Following Kaminski's assignment as Bolmer's case manager in 2003, the two began

---

[1] Pl.'s Local R. 56 Stmnt. [Doc. # 153] at ¶ 148.

[2] *Id.* at 158.

[3] Kaminski Dep. at 31:15-21.

frequently speaking on the telephone for extended periods of time, and exchanged a large

number of text messages.  Mr. Bolmer alleges that the relationship between him and Kaminski

became sexual around February 2004,[4] and that the two would meet at Ms. Kaminski's

apartment in Naugatuck, Connecticut once or twice a week.  Mr. Bolmer alleges that he gave Ms.

Kaminski flowers "all the time," as he did on September 13, 2004, when he placed roses

underneath a windshield wiper of Ms. Kaminski's car outside of her apartment.[5]  According to

Mr. Bolmer, the pair's relationship ended around that same day, when Ms. Kaminski told him

that she was in another relationship.

Ms. Kaminski denies the existence of a sexual relationship between the two and was

alarmed, as she reported to her supervisor, Rick Hammond.  She expressed her alarm that Mr.

Bolmer had come "uninvited from Danbury, all the way to Naugatuck, to my apartment, and left

flowers on my car."[6]  The next day, September 14, 2004, Kaminski informed Hammond and

Wilma Davidson, Bolmer's probation officer, that she had received two threatening voicemail

messages from Bolmer, the second of which was laced with profanity.[7]

Mr. Bolmer was summoned to the THP office on September 14, 2004, where he met with

Mr. Hammond.  During that meeting, Bolmer described the extent of the contact between him

and Kaminski, alleging that the pair had a sexual relationship, and asking to be moved to

---

[4] Bolmer Dep. at 42:1-4.

[5] *Id.* at 43:14-18.

[6] Kaminski Dep. at 154:6-8.

[7] *See* Pl.'s Local R. 56(a)(2) Statement ¶ 16.

4

different housing where he would not come into contact with Kaminski.  Bolmer proceeded

from the meeting with Hammond to the offices of the GDMHA, where he met with Michael

Anello, a caseworker, and later, with Dr. Joseph Oliveira, a psychiatrist.

Mr. Bolmer contends that the GDMHA staff discredited his story about his sexual

relationship with Ms. Kaminski, believing it to be the product of a delusion, and set in motion a

series of events in which Mr. Bolmer was involuntarily committed, restrained, and medicated

solely on the basis that no one believed his account of the relationship with Kaminski.

According to Mr. Bolmer, Dr. Oliveira summoned police and an ambulance crew before

speaking with the plaintiff, "rolled his eyes" when Mr. Bolmer explained that he had been

sleeping with Ms. Kaminski,[8] and made the decision to involuntarily commit him following a

cursory examination:

> Yeah, well, he just said we're going to give you a mini mental test, motor, tree,
> giraffe, and I'm going to ask you to recall these things after a few minutes.  And it
> wasn't that many minutes, and he said to me say it again, and I came up with the
> two and I said why are you asking me these questions?  And he just walked over
> to the door and it opened up and everyone came rushing in.[9]

Mr. Bolmer was transported by ambulance to Danbury Hospital, where he was first examined by

Dr. Victor Estaba, an emergency room physician, and Dr. Diane DeKeyser, a psychiatrist.

According to Mr. Bolmer, DeKeyser did not ask him any questions, but informed him

---

[8] Bolmer Dep. at 56:11.

[9] *Id.* at 55:21-56:3.

that he was confined at the Hospital pursuant to the emergency certificate which Dr. Oliveira

signed.[10]  Mr. Bolmer alleges that DeKeyser spent fewer than five minutes examining him, but

that in that time he told her that Dr. Oliveira had been incorrect in his assessment of Mr.

Bolmer's mental state.[11]  Mr. Bolmer alleges that he next fell asleep for a time, until Dr. Estaba

examined him.  Although Mr. Bolmer is unable to recall the questions which Estaba asked him,

Bolmer told Estaba that he was in the hospital "for saying I was sleeping with Lisa."[12]  According

to Bolmer, Dr. Estaba then ordered him to take an oral dose of Geodon, an anti-psychotic

medication.  Mr. Bolmer refused, Dr. Estaba left, and the plaintiff fell back asleep.  When Estaba

returned, Mr. Bolmer alleges that he was forcefully and painfully restrained by the hospital's

security staff while a nurse injected him with Geodon.[13]

Mr. Bolmer was then admitted to the hospital and placed in a bed on the hospital's

psychiatric wing.  He remembers little about what transpired after being forcibly administered

the Geodon, but avers that the only person to take seriously his story about his relationship

seriously was Kieran Delamere, a case manager at the hospital.  Mr. Bolmer asserts that once Mr.

Delamere heard the plaintiff's account on September 16, 2004, he checked Mr. Bolmer's cell

---

[10] Mr. Bolmer was detained on a physician's emergency certificate, pursuant to Conn. Gen. Stat. § 17a-502(a), which provides that "[a]ny person who a physician concludes has psychiatric disabilities and is dangerous to himself or others or gravely disabled, and is in need of immediate care and treatment in a hospital for psychiatric disabilities, may be confined in such a hospital, either public or private, under an emergency certificate as hereinafter provided for not more than fifteen days without order of any court."

[11] Bolmer Dep. at 60:12-15.

[12] Id. at 66:4-6.

[13] Id. at 71:1-72:21.

phone, read some of the text messages from Ms. Kaminski, and had Mr. Bolmer discharged immediately.

The defendants' version of events differs markedly. According to the defendants, when Mr. Bolmer met with GDMHA staff member Michael Anello on September 14, 2004 and recounted his relationship with Kaminski, Anello deemed a psychiatric examination of Mr. Bolmer appropriate, because elements of Bolmer's account sounded delusional, for example, Bolmer's representation that he and Kaminski had been in a relationship for a year although Bolmer had spent five or six months of the prior year at Connecticut Valley Hospital,[14] where he had been sent in February 2003 by the Connecticut Superior Court to restore his competency to stand trial.[15] Anello also thought that Bolmer's explicit account of the sex acts which he alleged transpired between him and Kaminski was "just very over the top, sort of graphic," and disrespectful towards Kaminski.[16] Finally, Anello was concerned that Bolmer's long string of arrests and "history of assaultive behavior" increased the likelihood that he would attempt to seek out and confront Ms. Kaminski.[17]

Anello left Mr. Bolmer in his office for several minutes while he went to get Dr. William Oliveira, a GDMHA psychiatrist, but when the two returned to Anello's office, Bolmer was

---

[14] Anello Dep. 123:24-124:4. Mr. Bolmer was sent to Connecticut Valley Hospital by the Connecticut Superior Court.

[15] Pl.'s Local R. 56(a)(2) Statement at ¶ 11.

[16] Anello Dep. at 128:24-129:3.

[17] *Id.* at 129:30-130:8.

gone.[18]  Mr. Bolmer testified that he had waited in Anello's office for about thirty seconds before

deciding instead to go register a truck at the Department of Motor Vehicles and have lunch at

Taco Bell.[19]  During his errand, Mr. Bolmer's probation officer reached him on his cell phone

and ordered him to return to the GDMHA offices or have his probation revoked.[20]

Bolmer reappeared at the GDMHA offices around noon, asking to see Anello.  This time,

Anello noted that Mr. Bolmer was "more agitated and aggressive than before . . . [h]is voice was

significantly elevated, and he couldn't sit still, and he was waving his arms around."[21]  Anello

brought Mr. Bolmer to a common area of the offices where Dr. Oliveira was to examine the

plaintiff.  Prior to entering the room, Dr. Oliveira could hear that Mr. Bolmer was "very agitated

and was screaming very, very loudly."[22]  Oliveira testified that during his attempted interview of

Mr. Bolmer, the plaintiff was intent on recounting the litany of injustices which he viewed as

having been inflicted upon him by the courts, the police, his brother, and Kaminski.  Dr. Oliveira

was unable to calm Bolmer, who was red-faced and talking in a loud voice, but Bolmer

responded with "the same repetitive, insistent verbalization" of past wrongs,[23] which "raise[d] a

---

[18] *Id.* at 131:6-10.

[19] Bolmer Dep. at 48:1-25.

[20] *Id.*

[21] Anello Dep. at 132:18-23.

[22] Oliveira Dep. at 73:6-8.

[23] *Id.* at 77:15-25.

flag" as to Bolmer's mental condition.[24]  Oliveira recounted that Mr. Bolmer "came across as very angry and very hostile, very threatening,"[25] and told Oliveira that he refused to take his medication.[26]  According to Anello, Mr. Bolmer became "really, really loud" and began describing acts of violence, which made Anello conclude that Bolmer was "not in control of his behavior."[27]

Dr. Oliveira alleges that as his attempts to interview Mr. Bolmer progressed, Bolmer's "hostility and anger[] were getting worse," leading Oliveira to believe that there was "no time" to locate Mr. Bolmer's regular psychiatrist and discuss the plaintiff's psychiatric history.[28]  By the end of the interview, Dr. Oliveira felt that the interview had become "unsafe" for himself and GDMHA staff, and that further evaluation needed to be done in an emergency room.[29]  Noting in his records that Bolmer was, "in my clinical opinion . . . dangerous and poses a threat to others," Oliveira signed the emergency certificate of involuntary commitment, and Bolmer was transported to Danbury Hospital.[30]

---

[24] *Id.* at 82:16-25.

[25] *Id.* at 81:18-19.

[26] *Id.* at 91:6-7.

[27] *Id.* at 151:11, 152:7-9.

[28] *Id.* at 95:2-6.

[29] *Id.* 105:12-18.

[30] Oliveira Dep. at 108:18-25.

Dr. DeKeyser's account of her encounter with Mr. Bolmer also differs from plaintiff's. According to DeKeyser, in her initial attempt to speak with Mr. Bolmer, she found the plaintiff highly agitated, "unable to communicate in an organized, coherent fashion," and insistent upon recounting his "belief that there had been a conspiracy set up to persecute him."[31] Moreover, DeKeyser recalled that Mr. Bolmer "had a presence, a countenance and a posture, that virtually everyone felt was intimidating," and that he "behaved in a way that caused a lot of people to be wary and hyper vigilant about what action he would take next."[32] DeKeyser made several attempts to interview Bolmer, but was unable to get past greeting him before he began rapidly recounting the conspiracy against him – each time, DeKeyser felt intimidated by Mr. Bolmer, and "concluded that [she] was in danger."[33]

Later in the evening, DeKeyser testified that she attempted to gain rapport with Bolmer by striking a deal with him: DeKeyser proposed that she would leave the door to Bolmer's seclusion room open, and talk to him by standing just outside of the door. He, in turn, was to stay inside the room. Despite his agreement, Bolmer "came at" DeKeyser as she stood in the doorway, and hospital security guards prevented Mr. Bolmer from leaving the seclusion room.[34] At that point, DeKeyser decided that Bolmer would need to be admitted to the hospital's psychiatric ward "[f]or stabilization and treatment of his psychiatric illness" and "[t]o prevent

---

[31] DeKeyser Dep. at 25:21-26:6.

[32] *Id.* at 26:16-23.

[33] *Id.* at 28:2, 30:4-10.

[34] *Id.* at 57:10-13.

him from harming anyone else."[35]  However, DeKeyser feared that Bolmer would react violently to being told that he was to be admitted to the hospital, and so she ordered that Bolmer take an oral dose of Geodon, an antipsychotic drug, but gave Bolmer the option of not taking the Geodon if he would voluntarily calm down.[36]  Approximately one hour later, when Bolmer had neither calmed down nor taken the Geodon, DeKeyser ordered that Bolmer be given the medication via intramuscular injection.[37]  In preparation for the injection, hospital security staff forcibly placed Mr. Bolmer into four-point restraints.  Some time later, after DeKeyser determined that Mr. Bolmer "continued to pose a threat of danger to others around him," he was given a second dose of Geodon and transported to hospital's psychiatric ward.[38]

The next morning, September 15, 2004, Mr. Bolmer was evaluated by defendant Dr. Donna Pellerin, a psychiatrist working in the Hospital's psychiatric unit.  When Pellerin began the interview, she claims that Mr. Bolmer was hostile and was "[r]eiterating over and over the same sentence or words" about his relationship with Kaminski.[39]  According to Pellerin, Bolmer would not follow the instructions of the hospital staff, would not accede to Pellerin's request that he sit down for the interview, and was behaving in a "loud, kind of in-your-face kind of

---

[35] *Id.* at 190:3-9.

[36] *Id.* at 87:16-25.

[37] *Id.* at 89:17-18.

[38] *Id.* at 91:16-14.

[39] Pellerin Dep. at 63:20-22.

manner."[40] Dr. Pellerin testified that Bolmer told her that he had stopped taking Risperdal – an antipsychotic medication which he had been prescribed prior to September 2004 – because it caused sexual dysfunction. Pellerin recounted that Bolmer insisted upon telling her the reason why he stopped taking Risperdal "in a very aggressive way . . . as though he was trying to intimidate me as a woman."[41] Because of Mr. Bolmer's behavior, Dr. Pellerin decided that Mr. Bolmer would not be discharged that day.

Dr. Pellerin evaluated Mr. Bolmer again on September 16, 2004, and found him to be markedly more cooperative, and "in better behavioral control."[42] He had resumed taking his medication, and was following staff directions. He was able to sit down and converse with her, and, as a result of his newfound calm, was able to relate the circumstances of his relationship with Kaminski, a development which further calmed Mr. Bolmer once he realized that Pellerin "understood the story and . . . believed the story."[43] Pellerin was able to verify Bolmer's account of his relationship with Kaminski by having hospital security read some of the text messages on Mr. Bolmer's mobile phone. Pellerin testified that it had been impossible to do so earlier because the plaintiff "was so agitated" that Pellerin "couldn't have any normal communication with him."[44] Mr. Bolmer was discharged that day into the care of a friend, with instructions to stay

---

[40] *Id.* at 83:24-84:4.

[41] *Id.* at 87:1-9.

[42] *Id.* at 94:1-5.

[43] *Id.* at 96:11-16.

[44] *Id.* at 99:4-8.

away from the Transitional Housing Program.

Both the Danbury Hospital defendants and the DHMAS defendants now move for summary judgment on all of Mr. Bolmer's claims.

## II.    The Summary Judgment Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied by pointing to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex*, 477 U.S. at 322-23. "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial," but "need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures*

*Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex*, 477 U.S. at 324); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223-1224 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). To defeat summary judgment, the non-moving party must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249 (noting that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"). Ruling on summary judgment, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion, *Matsushita*, 475 U.S. at 587, but "may not make credibility determinations or weigh the evidence." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006).

## III.     The Plaintiff's Claims Against the DMHAS Defendants

### A.     The Fourteenth Amendment

In Counts One and Two, Mr. Bolmer alleges that Dr. Oliveira violated his due process rights by involuntarily committing him in the absence of conditions warranting issuance of the emergency certificate. Oliveira contends that he is entitled to qualified immunity on these claims, and therefore summary judgment should be granted in his favor.

Qualified immunity shields government officials for "performing discretionary functions," and whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kaminsky v. Rosenblum*, 929 F.2d 922,

925 (2d Cir. 1991). Qualified immunity is a shield from suit, not just a defense, and its applicability must be determined by following the sequential framework from *Saucier v. Katz*, 533 U.S. 194, 200-206 (2001). "The threshold question is whether the facts, taken in the light most favorable to the plaintiff, show a constitutional violation." *Cowan v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003). If the answer to this question is affirmative, the defendant government official is qualifiedly immune and entitled to summary judgment "if either (1) his actions did not violate clearly established law or (2) it was objectively reasonable for him to believe that his actions did not violated clearly established law." *Iqbal v. Hasty*, 490 F.3d 143, 152 (2d Cir. 2007). But summary judgment on qualified immunity grounds is not appropriate if there are material factual issues still in dispute. *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir. 1998).

As to the first step of the *Saucier* analysis, there is no dispute that individuals enjoy a substantive due process right to bodily integrity which protects against involuntary hospitalization. *E.g. Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). Where a person has substantive due process right, there are accompanying "minimum procedures required by the Constitution" which must be followed by a State when determining whether "the individual's liberty interest actually is outweighed in a particular instance." *Mills v. Rogers*, 4567 U.S. 291, 299 (1982). However, because "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances," the required minimum procedures which a State must follow before depriving an individual of this right varies depending on the nature of the right and the context in which the right is being taken

away.  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal quotations omitted).

Accordingly, States are forbidden from involuntarily hospitalizing an individual unless he is "a danger either to h[im]self or to others."  *Anthony*, 339 F.3d at 142.   The Connecticut statutory regime governing involuntary hospitalization is in accord with this due process requirement, permitting a physician to order the involuntary confinement of an individual only where the person "has psychiatric disabilities and is dangerous to himself or others or gravely disabled, and is in need of immediate care and treatment in a hospital for psychiatric disabilities."  Conn. Gen. Stat. § 17a-502(a).  The Second Circuit has held that no judicial or administrative hearing is required before involuntary commitment occurs.  *Project Release*, 722 F.2d at 975.  Rather, a physician's decision to involuntarily commit an individual in an emergency must "be made in accordance with the standards of the medical profession."  *Rodriguez*, 72 F.3d at 1062-1063.  Thus, any physician making such a decision must exercise the commitment power "on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community. Due process requires no less."  *Id.*  While the mere act of examining the patient and reaching a conclusion as to his suitability for commitment does not, alone, satisfy due process as a matter of law, "the question of what the generally accepted standards were is a question of fact" to be determined by the testimony of experts.  *Id.* at 1063.

Thus, *Rodriguez* dictates that Mr. Bolmer's due process claim rises and falls with evidence of whether Dr. Oliveira's actions fell "substantially below the standards generally accepted in the

medical community," the resolution of which requires consideration of expert opinion. Mr.

Bolmer has tendered the affidavit of his expert, Dr. Kenneth Selig, who opines that Dr. Oliveira's

examination of the plaintiff "substantially departed from accepted judgment, practices, and

standards," because it was "not possible to engage in the kind of action necessary to constitute a

minimally competent examination in five minutes," the length of time which Mr. Bolmer

testified elapsed during his evaluation at the DMHAS offices on September 14, 2004.[45] Selig

further opines that Dr. Oliveira failed to properly calm Mr. Bolmer down during the

examination and permit the plaintiff an opportunity to substantiate his claims of a sexual

relationship with Ms. Kaminski,[46] and that Oliveira was required by "minimum professional

standards" to make a more thorough attempt to determine if Mr. Bolmer truly intended to harm

Kaminski.

The DMHAS expert, Dr. Howard Zonana, reaches the opposite conclusion. In a letter to

the DMHAS defendants' counsel, Dr. Zonana opined that "the standard of care for [an]

evaluation varies somewhat with the external circumstances and the patient's condition," but

concluded that "the combination of [Mr. Bolmer]'s escalating angry behavior, inability to discuss

issues with treatment team and the psychiatrist, coupled with [Mr. Bolmer]'s past history of

threats . . . all make for a situation that warranted a PEC and referral to a hospital emergency

---

[45] Selig Aff. [Doc. # 156] at ¶ 27.

[46] *Id.* at 30.

room."[47]

The competing testimony of the parties' experts makes the nature and adequacy of Dr. Oliveira's exam – and thus, the constitutional sufficiency of the process due Mr. Bolmer before his involuntary commitment – impossible to resolve short of trial.  Each expert has based his opinion on material facts in dispute which require resolution by the factfinder: if Mr. Bolmer's account of the events of September 14, 2004 is correct, then Dr. Zonana's conclusion is based on a flawed factual basis, namely plaintiff's anger and uncooperativeness, which Mr. Bolmer contends he did not display.  If, on the other hand, the DMHAS defendants' accounts are credited, then Dr. Selig's conclusion that Oliveira's no-more-than-five-minute examination was deficient is predicated on an erroneous factual basis.  This lack of factual certainty similarly makes resolution of the qualified immunity question impossible, as well: *Saucier* commands that courts determine whether the defendant state officer's actions did not violate clearly established law, or, whether it was objectively reasonable for him to believe that his actions violated clearly established law.  The former turns on Dr. Oliveira's actions, and the latter on Mr. Bolmer's, both of which are disputed by the parties.

Finally, the differing medical standards at play in the experts' reports preclude summary judgment.  While Dr. Selig did not explicitly identify the medical standard by which he evaluated Dr. Oliveira's performance, he testified at his deposition that he based his conclusions around "a negligence standard," although he admitted that he was unsure "that that's the standard in this

_____

[47] Letter from Dr. Howard Zonana to Emily Melendez 3, 4 (July 10, 2007) [Doc. # 138, Ex. FF].

case."[48]  As discussed earlier, Dr. Zonana concluded that the standard of care due a mentally ill patient varies with the circumstances of the examination.  Because *Rodriguez* held that the applicable standard by which the defendant's actions are to be judged is a question of fact, and the parties' experts here do not agree on the medical standard, the applicable standard under the circumstances of this case  remains for determination at trial.  Summary judgment will therefore be denied on Counts One and Two.


**B.    State law tort claims**

In Count Nine of the Third Amended Complaint, Mr. Bolmer alleges that Dr. Oliveira committed the common law tort of false imprisonment when he involuntarily committed the plaintiff without an adequate reason for doing so.  Dr. Oliveira moves for summary judgment on this claim, arguing that sovereign immunity prevents Mr. Bolmer from bringing the state law claim against the State in federal court without the State's consent.  Mr. Bolmer opposes on the ground that Dr. Oliveira's actions were "grossly negligent," therefore relieving the State of the responsibility of answering for him and making sovereign immunity inapplicable.

The Eleventh Amendment to the United States Constitution bars the federal courts from entertaining suits "commenced or prosecuted against one of the United States by Citizens of another State," and this prohibition has been interpreted to extend to suits against states by their

---

[48] Selig Dep. at 141:4-7.

own citizens. *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). A state may waive its Eleventh Amendment immunity to suit in federal court, provided the state does so unequivocally, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984), but state statutory provisions consenting to suit in state court, like CFEPA, are not waivers of Eleventh Amendment immunity from suit in federal court. *Smith v. Reeves*, 178 U.S. 436, 441 (1900) ("A state does not consent to suit in federal court by consenting to suit in the courts of its own creation").

By Connecticut statute, the State's sovereign immunity is extended to its officers: "[n]o state officer or employee shall be personally liable for damage or injury, *not wanton, reckless or malicious*, caused in the discharge of his or her duties or within the scope of his or her employment," and anyone with a complaint against a state officer or agent must "present it as a claim against the state." Conn. Gen. Stat. § 4-165(a) (emphasis added). The Connecticut Supreme Court has concluded that "because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state," *Shay v. Rossi*, 749 A.2d 1147, 1165 (Conn. 2000), so long as the officer has not acted "wilfully or maliciously," in which case he is no longer immunized by § 4-165(a). *Martin v. Brady*, 802 A.2d 814, 817 (Conn. 2002). Although the Connecticut Supreme Court has "never definitively determined the meaning of wanton, reckless or malicious as used in § 4-165," it has held that plaintiffs seeking to overcome a state officer's immunity must prove on the part of the defendant conduct evincing a state of mind which

> is more than negligence, *more than gross negligence* . . . there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid

20

danger to others or to take reasonable precautions to avoid injury to them . . .
conduct tends to take on the aspect of highly unreasonable conduct, involving an
extreme departure from ordinary care, in a situation where a high degree of
danger is apparent.

*Id.* at 819 (emphasis added); *accord Bishop v. Kelly*, 539 A.2d 108, 111 (Conn. 1988)

("Recklessness requires a conscious choice of a course of action either with knowledge of the

serious danger to others involved in it or with knowledge of facts which would disclose this

danger to any reasonable man, and the actor must recognize that his conduct involves a risk

substantially greater than that which is necessary to make his conduct negligent.") (internal

citation omitted).

In opposition to dismissal of this tort claim against Dr. Oliveira, Mr. Bolmer points to the

magnitude of the deprivation associated with involuntary confinement and argues that a jury

could find that Oliveira's cursory examination of the plaintiff and resulting confinement was the

result of "more than negligence or gross negligence."[49]  That analysis substitutes the results of

Oliveira's actions for an examination of their consequences.  Although Mr. Bolmer's allegations,

if true, could support a finding of negligence on the part of Dr. Oliveira, he points to no acts or

statements which demonstrate malice or wantonness.  By Mr. Bolmer's account, Oliveira

reached the wrong conclusion as to Mr. Bolmer's mental fitness, because he impermissibly short-

changed Mr. Bolmer during the mental examination, *see* Bolmer Dep. at 56:11 ("he just said

we're going to give you a mini mental test, motor, tree, giraffe, and I'm going to ask you to recall

these things after a few minutes.  And it wasn't that many minutes, and he said to me say it

---

[49] Pl.'s Opp. to Summ. J. [Doc. # 147] at 38.

again, and I came up with the two . . . [a]nd he just walked over to the door and it opened up and everyone came rushing in").  The evidence which Mr. Bolmer has marshaled in support of his claims may point to indifference, but there is no evidence of extreme conduct which could satisfy the intentionality required by the Connecticut Supreme Court to eliminate Dr. Oliveira's immunity against suit on the state law claims in this Court.  *See Bloom v. Gershon*, 856 A.2d 335, 345 n.11 (Conn. 2004) (in a medical malpractice action, "none of the complaints" against the defendant alleged wanton, reckless or malicious conduct sufficient to pierce § 4-165 immunity).  Accordingly, the allegations in Count Nine against Dr. Oliveira will be dismissed.

### C.  The ADA Claim

Lastly, in Count Seven, Mr. Bolmer alleges that DMHAS violated his rights under Title II of the Americans With Disabilities Act (ADA) by "stereotyping Mr. Bolmer as an unreliable individual who manifested delusions because of his diagnosed mental illness." DMHAS has moved for summary judgment on this count on two grounds: first, that Mr. Bolmer's claim is barred by sovereign immunity; and second, that the ADA does not address stereotyping as Mr. Bolmer has alleged, and that as such, the plaintiff has not stated a claim which is cognizable under the ADA.

Title II of the ADA, which prohibits disability discrimination in public services, guarantees in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Congress defined "public entity" to include "any State or local government," in addition to "any department, agency . . . or other instrumentality of a State." § 12131(1). One is a "qualified individual" entitled to § 12132's protections where one is "an individual with a disability who, with or without reasonable modifications [to the services in question] . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). Plaintiffs pressing Title II claims must establish a prime facie case of discrimination by showing "(1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Title II specifies that a "State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this Act." 42 U.S.C. § 12202. The Supreme Court has held this to be a valid Congressional abrogation of State sovereign immunity which "creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151, 159 (2006) (emphasis in original). In assessing a claim of sovereign immunity to a Title II claim, courts examine "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the

Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* Here, the second and third prongs of *United States v. Georgia* are not in dispute, as the occurrences comprising the alleged violation of Mr. Bolmer's due process rights are identical to his Title II claim.

The DMHAS defendants urges that the conduct which Mr. Bolmer accuses DMHAS of – impermissible stereotyping – does not contravene a right protected by the ADA, which DMHAS formulates as the "right to be believed."[50] DMHAS cites the regulations implementing Title II which define prohibited discrimination, *see* 28 C.F.R. § 35.130, and argues that "[nowhere] in this extensive list is there a prohibition against choosing to believe or not believe someone's statements."[51]

This is too cramped a view of Mr. Bolmer's allegations: although Count Seven identifies "stereotyping" as the prohibited behavior which violated Title II, the plaintiff incorporates by reference the other allegations contained in his Third Amended Complaint, and sets forth that the stereotyping occurred when DMHAS "assum[ed] that Mr. Bolmer's allegations about his sexual relationship were false."[52] Mr. Bolmer grounds his due process claims on the same allegations – that the DMHAS defendants assumed him to be delusional because of his

---

[50] DMHAS Defs.' Mot. for Summ. J. at 16.

[51] *Id.* at 11.

[52] Third Amended Compl. at ¶ 138.

purported sexual relationship with Kaminski and substituted their assumption for an adequate examination. While DMHAS is literally correct that stereotyping in not recited in the Title II regulations, the ADA itself memorializes Congress's intent to combat stereotyping of handicapped individuals:

> The Congress finds that . . . individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals *and resulting from stereotypic assumptions* not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

42 U.S.C. § 12101(a)(7) (emphasis added). *See Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1108 (S.D. Ga. 1995) (denying summary judgment to employer where it justified plaintiff's termination because plaintiff "'constantly complained, rarely worked his scheduled hours, overstated his physical complaints, and wanted to avoid work,' justifications which . . . a jury could also infer . . . are merely pretext and represent the kind of demeaning stereotypes that the ADA and other anti-discrimination laws seek to address."). *Cf. Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611 (1993) ("Congress' promulgation of the [Age Discrimination in Employment Act] was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes . . . . The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly."); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58 (1st Cir. 1999) (In Title VII race discrimination cases, "[t]he ultimate question is whether the employee has been treated

disparately 'because of race.' This is so regardless of whether the employer consciously intended to base the evaluations on race, or simply did so because of unthinking stereotypes or bias.").

The ADA is a remedial statute which is to be liberally construed. *Henrietta D.*, 331 F.3d at 279. Befitting this remedial purpose, Mr. Bolmer has a number of ways in which to prove a violation. *Id.* at 272 (a plaintiff must show that he was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or w[as] *otherwise discriminated against* by defendants, by reason of plaintiffs' disabilities") (emphasis added). If events transpired as the plaintiff alleges, then reasonable jurors could conclude that the DMHAS defendants assumed him to be delusional on the basis of a stereotype that mentally ill individuals such as Mr. Bolmer are only fantasizing sexual relationships with persons with whom they have a treatment relationship. If that stereotype indeed resulted in substitution of general impressions of the mentally handicapped for the medical care which the plaintiff was due, then the DMHAS defendants have improperly relied upon a proxy in violation of Title II and of the Fourteenth Amendment, thereby stripping the State of any Eleventh Amendment immunity to the plaintiff's ADA claim.

The ultimate resolution of the applicability of the State's immunity and defense to the ADA claim thus depends upon facts still in dispute, to wit, whether or not Dr. Oliveira conducted a deficient examination of Mr. Bolmer on the basis of his disbelief of Mr. Bolmer's narrative. Because it is not possible to resolve those factual questions on this record, summary judgment on Count Four will therefore be denied.

IV.     **Claims Against The Danbury Hospital Defendants**

A.      **Constitutional Claims**

In Counts Two through Six of his third amended complaint, Mr. Bolmer claims that the Danbury Hospital defendants – Drs. Estaba, DeKeyser, and Pellerin – violated his due process rights by involuntarily restraining and medicating him.  The Danbury Hospital defendants have moved for summary judgment on these counts, arguing that they are not state actors, and as such cannot face liability for Constitutional violations.

In relevant part, Section 1983 of title 42 of the United States Code provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  To prove a claim under § 1983, a plaintiff must show "(1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  *Dwares v. New York*, 985 F.2d 94, 98 (2d Cir. 1993).  Because the boundaries of the Constitution's protections, which may be invoked only against the government, "cannot be a simple line between States and people operating outside formally governmental organizations, . . . the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed."  *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001).  Thus, the

Supreme Court has enumerated situations in which a private actor may be said to be acting

under the authority of a State, and may thus be called to account for Constitutional violations:

> Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert," or when a private actor operates as a "willful participant in joint activity with the State or its agents." We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," when it has been delegated a public function by the State, when it is "entwined with governmental policies" or when government is "entwined in [its] management or control."

*Id.* at 296 (internal citations omitted) (alteration in original). Because there is no bright-line rule

dividing state action from private action, *id.* at 295-296, characterizing a private party as a state

actor for purposes of § 1983 necessarily "is a fact-specific inquiry," *Logan v. Bennington College

Corp.*, 72 F.3d 1017, 1027 (2d Cir. 1995).

Mr. Bolmer urges that the facts at bar are governed by the Ninth Circuit's decision in

*Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000), reflecting the entwinement methods of

determining state action. In *Jensen*, the plaintiff had been arrested for pointing a gun out of his

car window at a police officer; at booking, Jensen told officers that he routinely took prescription

medication for the treatment of depression. A few days after Jensen's arrest, while he was still

incarcerated, Jensen's boss telephoned the jail to report that Jensen had been acting strangely

prior to his arrest and had talked about workplace shootings. This report led Richard Sherman, a

mental health specialist employed by the county, to review Jensen's arrest records and interview

the plaintiff. After consulting with Dr. Robbins, a private psychiatrist who was a contract

employee of the county, and Dr. Ekanger, a county-employed psychiatrist, Sherman recommended that Jensen be held at the Lane County Psychiatric Hospital for further evaluation. Dr. Robbins, the contract psychiatrist, signed the detention order after reviewing Jensen's arrest records, but without examining Jensen. Jensen was thereafter held at the Hospital – itself a publicly owned facility staffed by private medical personnel under contract. By the expiration of the statutory temporary commitment period, Jensen had been examined by both Robbins and Ekanger, the latter of whom recommended that Jensen be released. Jensen was signed out of the Hospital by Robbins, and immediately brought suit against most of the individual's involved in his arrest and detention. In its brief state action analysis, the Ninth Circuit held that the arrangement between the county and its private contractors was a "complex and deeply intertwined process of evaluating and detaining individuals" initiated by public employees who relied upon the services of contracting psychiatrists, thus turning the actions taken by the private employees into state action addressable by § 1983. *Jensen*, 222 F.3d at 575.

It is not necessary to analyze whether the legal conclusion in *Jensen* would be followed in the Second Circuit because the facts here differ considerably, in that Mr. Bolmer's contact with the State concluded when Dr. Oliveira signed the emergency certificate and temporarily committed Mr. Bolmer to the Danbury Hospital. Following his departure from GDMHA, Mr. Bolmer only came into contact with private employees at a private facility: the record does not show any of the type of communication and coordination between public and private employees which occurred in *Jensen*. Mr. Jensen was seen alternately by public and private employees

during his sojourn through the Lane County psychiatric care system, and was eventually lodged in a publicly owned but privately run hospital, where public employees consulted with private employees regarding Mr. Jensen's commitment and release.  This tightly enmeshed choreography may indeed make *Jensen sui generis*, perhaps explaining its lack of widespread adoption in other Circuits.  *Jensen* bears no significant factual resemblance to Mr. Bolmer's experience, notwithstanding his contention that the coordination between DMHAS and Danbury Hospital was "a complexly intertwined system."

At oral argument, plaintiff's counsel identified the specific facts which make the Danbury defendants state actors under *Jensen*, as Connecticut's involuntary commitment status and the contract between DMHAS and Danbury Hospital.  However, the involuntary commitment statute alone cannot provide the basis for a finding state action: the Second Circuit has held that mere private use of a state involuntary commitment statute does not vest the private actor with the power of the state.  *Okunieff v. Rosenberg*, 996 F. Supp. 343, 353 (S.D.N.Y. 1998), *aff'd*, 166 F.3d 507, 508 (2d Cir. 1999) (per curiam) (affirming for "substantially the reasons set forth in the district court's comprehensive and scholarly opinion").

The contract between DMHAS and Danbury Hospital, requires the Hospital to provide services in the relevant geographic area and provides minimum requirements by which to measure the Hospital's performance.  However, the actions of a private entity performing services for a state under contract "'do not become acts of the government by reason of their significant or even total engagement in performing public contracts.'"  *Horvath v. Westport*

*Library Ass'n*, 362 F.3d 147, 152 (2d Cir. Conn. 2004) (quoting *Rendell-Baker v. Kohn*, 457 U.S.

830, 841 (1982)).  Further, the Supreme Court clarified in *Blum v. Yaretsky*, 457 U.S. 991 (1982),

that extensive and detailed state supervision of a private entity's actions is insufficient to impart

the state's imprimatur upon the private entity, because the protections of the Constitution may

be "invoked only when it can be said that the State is *responsible for the specific conduct* of which

the plaintiff complains."  *Id.* at 1004 (emphasis added).  Thus, the existence of a Danbury-

DMHAS contract for services, however detailed, cannot provide a basis for holding Danbury

liable under § 1983 absent a showing that the specific conduct at issue in this suit – the Danbury

defendants' involuntary restraint and medication of Mr. Bolmer during the period of September

14-16, 2004 – was the product of the State's doing.

 In the alternative to his *Jensen* theory of state action, the plaintiff also argues that the

contract and resulting State use of Danbury Hospital for provision of mental health services

shows that state action has occurred under the delegation of public function theory under which

private actors are deemed to undertake state action when they provide services under contract

which the State bears "an affirmative obligation to provide," *West v. Atkins*, 487 U.S. 42, 56

(1988), or exercise a power which has been "traditionally *exclusively* reserved to the State,"

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974) (emphasis added).

 At oral argument, plaintiff's counsel argued that the exclusivity requirement is inapposite

where individual rights are concerned, as distinct from the context of *Jackson*, which decided the

question of the due process due to electric utility customers prior to shut-off for non-payment.

Rather, the plaintiff asserts instead that the applicable delegation standard is found in *Kia P. v. McIntyre*, which held that "'[i]n certain instances the actions of private entities may be considered to be infused with "state action" if those private parties are performing a function public or governmental in nature and which *would have to be performed* by the Government but for the activities of the private parties.'" 235 F.3d 749, 757 (2d Cir. 2000) (quoting *Perez v. Sugarman*, 499 F.2d 761, 764-65 (2d Cir. 1974)) (emphasis added). The plaintiff has elided a crucial piece of the Second Circuit's analysis, however: as the court discussed at length in *Perez*, New York has voluntarily undertaken a statutory obligation to care for children, and has explicitly delegated that authority to certain private parties through which it provides child welfare services. Hence, the treatment of children by private entities pursuant to New York's child welfare laws may be challenged via § 1983:

> In accepting and retaining custody of children alleged to have been "neglected" or "abandoned," child-caring institutions of the type we have in this case perform a "public function." Any doubt that this function is a public one is dispelled by even a cursory reading of Section 395 of the New York Social Welfare Law (McKinney Supp. 1972) (NYSWL), which declares that government officials "*shall be responsible* for the welfare of children who are in need of public assistance and care, support and protection . . . ." In fulfilling this responsibility, however, the State may provide direct assistance or, should it so choose, the State may act "through an authorized agency." *Id.* . . . Thus, the statutory scheme expressly contemplates that in performing this public function of caring for children the State may utilize private entities of the sort we have here.

*Perez*, 499 F.2d at 765 (emphasis added). In *Perez* and *McIntyre*, the "but for" action which the private defendants undertook – caring for abused and neglected children – was an action which the State of New York would have been statutorily obligated to undertake in the absence of the

private entities. There is no such obligation here: the plaintiff has not identified any legal authority requiring Connecticut to provide mental health care to the public, and hence, the Danbury Hospital defendants were not providing services which would have to have been performed by Connecticut but for their provision of services. The plaintiff's reliance upon *McIntyre* and *Perez* is misplaced.

With respect to the exclusivity requirement, Mr. Bolmer suggests that the Second Circuit's terse affirmance of the district court's decision in *Okunieff,* 166 F.3d at 508 (affirming for "substantially the reasons set forth in the district court's comprehensive and scholarly opinion"), may somehow indicate that the court of appeals did not agree with the district court's exclusivity analysis. Nonetheless, the plaintiff cites no controlling case which undercuts the exclusivity requirement since *Jackson* was decided. *E.g.*, *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 56 (1999) (private insurer vested with the ability to "decid[e] whether to suspend payment for disputed medical treatment" not a state actor because such decisions not traditionally an exclusive governmental function); *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) ("Our holdings have made clear that the relevant question is not simply whether a private group is serving a 'public function.' We have held that the question is whether the function performed has been traditionally the *exclusive* prerogative of the State.") (internal citations omitted); *Perpetual Secs., Inc. v. Tang*, 290 F.3d 132, 138 (2d Cir. 2002) (the exclusivity requirement is, among the other state action tests developed in decision law, "clear direction from the Supreme Court"); *Disabled in Action v. Hammons*, 202 F.3d 110, 123 (2d Cir. 2000)

(defendant private organizations are not state actors when they assist individuals applying for Medicaid benefits because "none of them . . . have the authority to issue or deny Medicaid benefits and, consequently, do not exercise powers that are traditionally the exclusive prerogative of the State.") (internal quotation omitted). The plaintiff similarly fails to explain the basis for his assertion that the exclusivity requirement does not apply where the plaintiff has, in his formulation, asserted an "individual right": the exclusivity requirement found in *Jackson* and its progeny have been applied in the context of due process rights, the source of rights which Mr. Bolmer invokes. *E.g. Jackson*, 419 U.S. at 347-348 (petitioner "urged that under state law she had an entitlement to reasonably continuous electrical service to her home and that [respondent]'s termination of her service for alleged nonpayment . . . constituted 'state action' depriving her of property in violation of the Fourteenth Amendment's guarantee of due process of law"); *Rendell-Baker*, 457 U.S. at 834 (petitioner complained "that she had been discharged without due process because she exercised her First Amendment rights"); *Perpetual Secs., Inc.*, 290 F.3d at 137 ("The gravamen of Perpetual's claim . . . was that its due process rights under the Fifth and Fourteenth Amendments were violated because NASD requires its members to submit to compulsory arbitration of all disputes."). Finally, the plaintiff offers no explanation as to why the logic of the exclusivity requirement should not govern the delegation argument here: It would seem an odd result to conclude that the State has delegated its police power to involuntarily commit and care for the mentally ill to a private party where that power has statutorily been available for use by private physicians without the State's approval. Conn. Gen. Stat. § 17a-

502(a).

Thirdly, Mr. Bolmer points to evidence of consultation between Oliveira and Pellerin during the period in which Bolmer was lodged in the Danbury Hospital psychiatric wing as supporting a finding of coercion.[53]  This argument, however, is also foreclosed by *Blum*, which requires that the plaintiff alleging State responsibility for a private decision show that the State "has exercised coercive power or provided such significant encouragement, overt or covert, that the choice must in law be deemed to be that of the State."  *Blum*, 457 U.S. at 1004.  The record reveals no such circumstances.  Although Pellerin consulted with Oliveira, her unrebutted testimony was that it was for purposes of getting Mr. Bolmer's medical history.[54]  Mr. Bolmer points to no evidence suggesting that Oliveira, or any other DMHAS employee, compelled Pellerin not to discharge Mr. Bolmer, and as such, has failed to demonstrate that the Danbury defendants' action has been compelled by the State.

The remaining methods of analysis are similarly unavailing.  Under the doctrine of joint participation, a private entity may act under color of law when it "is a willful participant in joint activity with the State or its agents."  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) (internal quotation omitted).  On this record, the joint-participation theory is foreclosed by the threshold which Mr. Bolmer crossed when he left the GDMHA offices because the plaintiff

---

[53] Pl.'s Opp. at 18 ("Mr. Bolmer's treating physician at Danbury Hospital, defendant Pellerin, reached an assessment about Mr. Bolmer only after consulting with defendant Oliveira, the DMHAS physician who executed the PEC . . . [t]his collaborative approach to treatment of Mr. Bolmer further militates toward a finding of state action.").

[54] Pellerin Dep. at 110:20-111:6.

points to no evidence showing that Oliveira's participation extended beyond signing the emergency certificate. The private defendants were free to release the plaintiff, leave him unrestrained, and/or not medicate him. Their decisions on what to do were without involvement of the State and absent evidence of a link between the public and private defendants, a finding of state action under the joint participation theory must fail.[55]

Even taking Mr. Bolmer's evidence together, however, it fails to demonstrate state action. The methods of analysis identified in Supreme Court jurisprudence all require a quantum of state involvement not presented on this record: once Bolmer left the GDMHA offices, he was at the whim of the private defendants, and the State's input into his care ceased. Without the crucial element of state involvement in the particular wrongs alleged to have been perpetrated upon the plaintiff, the Danbury Hospital defendants cannot be held liable via § 1983. Accordingly, summary judgment will be granted to the Danbury Hospital defendants on Counts Two, Three, Four, Five, and Six.

**B.      State law tort claims**

In Counts Nine, Ten, and Eleven, Mr. Bolmer alleges that the Danbury Hospital defendants committed the common law torts of battery and false imprisonment as a result of his involuntary commitment, restraint, and medication.

---

[55]The remaining theory, where state action arises from the acts of a private entity controlled by an "agency of the State," *Pennsylvania v. Bd. of Directors of City Trusts of Philadelphia*, 353 U.S. 230, 231 (1957) is inapplicable given the parties agreement that Danbury Hospital is a private entity over which the State has no operational control, see Pl.'s Local Rule 56(a)(2) Statement at ¶¶ 35-37.

The Supreme Court of Connecticut has adopted the definition of battery found in the Restatement (Second) of Torts, that one is liable for battery if "'(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.'" *Alteiri v. Colasso*, 362 A.2d 798, 801 (Conn. 1975) (quoting Restatement (Second) of Torts, § 13). False imprisonment, on the other hand, "'is the unlawful restraint by one person of the physical liberty of another,'" *Rivera v. Double A Transp., Inc.*, 727 A.2d 204, 209 (Conn. 1999) (quoting *Felix v. Hall-Brooke Sanitarium*, 101 A.2d 500, 502 (Conn. 1953)), which is done "for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it." *Id.* (citing Restatement (Second) of Torts § 35).

The defendants argue that because Mr. Bolmer was treated in accordance with Connecticut statutes governing involuntary commitment, restraint, and medication, they necessarily did not commit the torts alleged. The Connecticut legislature has created two relevant privileges to these torts. First, Connecticut General Statutes § 17a-543(b) provides that "emergency treatment may be provided without consent" to a psychiatric patient where a physician personally observes that obtaining the consent provided for in this section would cause a medically harmful delay to a . . . patient whose condition is of an extremely critical nature." Second, § 17a-544(a) provides a privilege to place a psychiatric patient into restraints where "necessary because there is imminent physical danger to the patient or others and a physician so

orders."

The defendants urge that they are insulated by these statutory privileges against Mr.

Bolmer's tort claims. Count Nine alleges, in relevant part, that Dr. Pellerin and Danbury

Hospital falsely imprisoned Mr. Bolmer. In support of their motion for summary judgment on

Count Nine, the Danbury defendants point to Pellerin's testimony about the plaintiff's behavior

on September 15 and 16, 2004, the days on which Pellerin evaluated Mr. Bolmer on the

Hospital's psychiatric wing. Dr. Pellerin testified that on September 15th, Mr. Bolmer was loud,

hostile, intimidating, and insistent upon reiterating his contention that he slept with Ms.

Kaminski, leading her to reach the conclusion that his condition merited further treatment at the

hospital.[56] By the next morning, however, Dr. Pellerin found Mr. Bolmer to be in control of his

behavior and taking his medication, and thus decided to discharge him.[57]

In opposition, Mr. Bolmer does not present evidence which demonstrates the existence

of a dispute of material fact for trial resolution with respect to Pellerin's treatment of him: Mr.

Bolmer testified that after he received the injection of Geodon on September 14th – the day

before he saw Pellerin for the first time – he did not remember any further encounters with

Danbury Hospital staff, and that he has tried to "block out the bad things" about his time at the

hospital which traumatized him.[58] This testimony does not contradict Pellerin's account of

---

[56] *See* Pellerin Dep. at 63:20-22, 83:24-84:4, 87:1-9.

[57] *See id.* at 94:1-5, 96:11-16.

[58] Bolmer Dep. at 81:6-24.

September 15th and 16th, but merely confirms that the plaintiff does not remember what occurred, providing no rebuttal to Pellerin's account. Therefore, Mr. Bolmer has failed to demonstrate that a dispute of fact remains as to the claim against Pellerin and Danbury Hospital on Count Nine, and summary judgment will be granted to them on that count.

This sharply contrasts with Mr. Bolmer's testimony about his encounters with Drs. DeKeyser and Estaba, named as defendants to the Counts Ten and Eleven battery claims. As set forth above, Estaba and DeKeyser recalled Mr. Bolmer as being combative, dangerous, and uncontrolled. In their respective views, this behavior merited restraining him and injecting him with Geodon. Mr. Bolmer's recollection is markedly different: he claims that he was sound asleep when Dr. Estaba entered the room to administer the Geodon injection, and that Estaba had the security staff set upon him for no reason.[59] Similarly, Mr. Bolmer alleges that he was calm and non-threatening when speaking with Dr. DeKeyser, and that her examination of him was too cursory to have yielded the information necessary to determine that he was a danger to others and thus had to be medicated.[60]

Thus, as it pertains to Counts Ten and Eleven, the record also presents material factual conflicts requiring trial resolution as it does for Mr. Bolmer's due process claims against the State defendants, *i.e.*, the Danbury defendants' version of Mr. Bolmer's behavior showed him to require restraint and treatment, while Mr. Bolmer's version denies that he exhibited such

---

[59] Bolmer Dep. at 71:1-72:21.

[60] *Id.* at 60:12-15.

behavior.  Because the Court may not, at summary judgment, weigh competing evidence or assess the credibility of witnesses, the defendants' entitlement to the statutory privileges to involuntarily restrain and medicate the plaintiff cannot be resolved at this stage.  Hence, summary judgment will be denied to the defendants on Counts Ten, and Eleven.


### C.        The Rehabilitation Act Claim

Lastly, in Count Eight, the plaintiff alleges that Danbury Hospital violated Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), when it refused to discharge Mr. Bolmer because it impermissibly stereotyped him as incapable of being involved in the sexual relationship he claimed.  Danbury has moved for summary judgment on this count, arguing that Mr. Bolmer cannot establish a prime facie case under the Rehabilitation Act because he is not "otherwise qualified" for the service which he alleges was denied him.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  In order to establish a violation of § 794(a), a plaintiff must show "(1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was 'otherwise qualified' for the benefit that has been denied; (3) that he has been denied the benefits 'solely by reason' of his disability; and (4) that the benefit is part of a 'program or activity receiving Federal financial assistance.'"  *Doe*

*v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). The Second Circuit has held that the requirement that a plaintiff be "otherwise qualified" for the benefit which he alleges to have been denied means that the plaintiff is "a person who is qualified *in spite of* [his] handicap." *Doe v. New York University*, 666 F.2d 761, 775 (2d Cir. 1981) (emphasis in original). Thus, this section of the Act "prohibits discrimination against a handicapped individual only where the individual's handicap is unrelated to, and thus improper to consideration of, the services in question," because "the phrase 'otherwise qualified' is geared toward relatively static programs or activities such as education, employment, and transportation systems." *United States v. University Hosp.*, 729 F.2d 144, 156 (2d Cir. 1984). Because of this holding, the Second Circuit has emphasized that the "otherwise qualified" language of the Act "cannot be applied in the comparatively fluid context of medical treatment decisions without distorting its plain meaning." *Id.* As a result, § 504 of the Act "must allow a federally-funded program, such as the clinic here, the ability to consider a patient's handicap where that handicap gives rise to, or at least contributes to, the need for services." *Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992).

In opposition, Mr. Bolmer argues that the service to which he was entitled was "the taking of appropriate steps, consistent with the patient's wishes, to remove the patient from an inpatient setting upon the patient's request," in accordance with the Connecticut statutes governing treatment of psychiatric patients,[61] and that the Second Circuit cases dealing with Rehabilitation Act claims are inapposite because they did not involve the stereotyping behavior

---

[61] Pl.'s Opp. at 27-28.

of which he accuses Danbury Hospital.  In support of his position, Mr. Bolmer relies upon *First Step, Inc. v. City of New London*, a decision holding that a mental health organization could establish a § 504 claim against the defendant municipality for a zoning decision barring the plaintiff from locating a new facility in the town if the plaintiff could show that "the Zoning Commission was primarily motivated by bias against the psychiatrically disabled and the stated reasons for denying the application were but a pretext."  247 F. Supp. 2d 135, 150 (D. Conn. 2003).  *First Step* is readily distinguishable.  There the service which the plaintiff organization claimed it had been denied access to was "the benefits of the activities of the Zoning Commission, i.e., its investigations, reports and recommendations relating to the planning and development of the City," not medical treatment.  *Id.* (internal quotation omitted).  The Zoning Commission's service, therefore, presented the straightforward question of whether the plaintiff organization was otherwise qualified for the guidance of the Commission where the plaintiff's clients' handicaps were "unrelated to, and thus improper to consideration of, the services in question."  *University Hosp.*, 729 F.2d at 156.

Here, Mr. Bolmer's formulation of the service for which he was otherwise qualified – treatment in accordance with psychiatric patients' rights enshrined in Connecticut law – squarely calls for Danbury Hospital's consideration of his handicap, because the service to which he claims entitlement arises from the psychiatric disability which places Mr. Bolmer in the category of individuals entitled to the protections of the relevant Connecticut statutes.  Mr. Bolmer does not explain how Danbury Hospital was to determine whether he should benefit

from the statutory provisions governing discharge without taking his disability into consideration at all, as he claims the Rehabilitation Act requires. The undisputed factual context of Mr. Bolmer's claim further dooms Count Eight: Plaintiff is an individual with psychiatric disabilities, who had been housed in DMHAS's Transitional Housing Program after a stay at the Connecticut Valley Hospital for treatment of his psychiatric condition, who had been assigned Ms. Kaminski to assist in transitioning back to life in the community, and whose treating psychiatrist, Dr. Oliveira, involuntarily committed to Danbury Hospital. To now posit that Danbury Hospital was required to ignore Mr. Bolmer's disability when determining if he was "otherwise qualified" to be discharged under the statute governing commitment of psychiatric patients is untenable. Accordingly, summary judgment will be granted to the defendant on Count Eight.

**V.    Conclusion**

For the reasons set forth above, the DMHAS defendants' motion for summary judgment on Counts One, Two, and Seven [Doc. # 138] is DENIED.  The Danbury Hospital defendants' motion for summary judgment [Doc. # 139] is GRANTED as to Counts Two, Three, Four, Five, Six, Eight and Nine, and DENIED as to Counts Ten and Eleven.  Because no claims remain against Dr. Donna Pellerin, she is dismissed as a defendant.


IT IS SO ORDERED.

/s/

_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 5th day of August, 2008